IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                    _____
                        :
UNITED STATES OF AMERICA  :
                        :
      v.                :        Criminal No. 10-484 (JBS)
                        :
SHAWN COLEMAN,          :
                        :            OPINION
            Defendant.  :
                    _____:
```

APPEARANCES:

PAUL J. FISHMAN
United States Attorney
By:  JAMES LYNCH
     Assistant U.S. Attorney
U.S. ATTORNEY'S OFFICE
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ  08101
     Attorney for the United States of America

MORRIS W. PINSKY, ESQUIRE
318 Haddon Avenue
Westmont, NJ  08108
     Attorney for Defendant

SIMANDLE, District Judge:

## I.  <u>INTRODUCTION</u>

Defendant Shawn Coleman is charged in a one-count Indictment with being a previously convicted felon in possession of a loaded handgun on November 5, 2009, in violation of 18 U.S.C. § § 922 (g)(1) and 18 U.S.C. § 2.  Presently before the Court are:  (1) Defendant's motion to suppress evidence consisting of the gun and several statements obtained by the arresting officers; and (2) the United States' motion for admission of certain evidence of a

prior conviction and other bad acts under Rule 404(b), Fed. R.
Ev., and to utilize all of defendant's prior convictions to
cross-examine defendant and to impeach his credibility should he
choose to testify at trial.

The Court has received the briefs and supplemental briefs of
counsel and evidence submitted at a suppression hearing.  The
principal issue to be decided is whether the United States has
demonstrated just cause for police officers to enter the vehicle
in which defendant was asleep or unconscious in the driver's seat
with the engine running and to seize a handgun found next to him
in the front console, under the emergency exception to the Fourth
Amendment's warrant requirement.  The Court must also decide
whether the United States has demonstrated that several post-
arrest statements by defendant, at the scene, during a subsequent
police car ride and during booking procedures are admissible and
not in contravention of defendant's rights.


## II.   <u>FACTUAL BACKGROUND</u>

About 2:00 A.M. in the early morning hours of November 5,
2009, the Lindenwold, New Jersey Police Department received a
telephone call from a resident of the Pine Ridge Apartments
complaining about a motor vehicle.  The caller told police that
an unknown vehicle was parked with its bright lights shining in
the apartment's window, and the police were requested to

investigate.  The police dispatcher put out a call to officers on patrol and two officers responded in their vehicles, namely Ptl. Arthur W. Hall and Ptl. George Przybylski.

Officer Przybylski testified that he arrived first at the scene, and Officer Hall arrived within a minute as his backup. Przybylski and Hall parked their police vehicles to illuminate the suspicious vehicle, which was a Saturn SUV with New York license plates.  The officers saw the vehicle was running with its high beams illuminating the apartment's windows.  They saw a man seated in the driver's seat, with the radio playing loudly inside the vehicle.  The officers saw no signs of the man's movement or breathing.  The officers stood on either side of the vehicle and Officer Przybylski knocked on the driver's side window with his flashlight and hollered in an attempt to rouse the man, and Officer Hall did the same on the passenger side window.  The man made no response despite the officers' commotion.  The man seemed to be in a deep sleep or daze, according to Hall's testimony.  Przybylski believed the driver was sleeping, intoxicated, or had a medical problem.  Both officers reasonably believed that knocking their flashlights on the window and shining them into his face should have been enough to rouse someone who was just sleeping.

Both officers reached the conclusion that there was an emergency that required them to enter the vehicle to attempt to

3

rouse and assist the driver and to shut off the engine and
lights.

Przybylski opened the unlocked driver's door, while Hall
opened the unlocked passenger side door.  Przybylski shook the
driver on the shoulder to try to rouse him, again without
success, as Hall reached in across the passenger seat to the
ignition key to shut off the engine and remove the key.  This was
necessary to protect the officers in case the man was startled to
consciousness and would reflexively try to drive away.  Officer
Hall then reached up to take the man's pulse at his neck, when he
saw the butt of a handgun sticking out of the center console,
depicted in photographic exhibits (Ex. G-3, 4, & 5).  Hall
alerted Przybylski to the gun.  The console was in its open
position and the gun was easily visible to Officer Hall from the
passenger side as demonstrated in these photos.  Hall took the
handgun from the console and secured it in his left pants pocket.
Przybylski pulled the driver out of the vehicle and on to the
ground, and as the driver was regaining consciousness or waking
up, Przybylski placed him in handcuffs for the safety of the
officers as they took him into custody.

The officers brought the driver, who turned out to be Shawn
Coleman, to his feet.  Hall asked him why he was carrying the
gun, and whether he was an off-duty officer or someone permitted
to have the gun, to which Coleman responded it was for

4

protection.  Hall also asked him whose car it was, and Coleman
said it was rented by his girlfriend.[1]

The officers patted Coleman down and escorted him to
Przybylski's patrol car, and they asked him no further questions.
Przybylski advised him that he was being detained for the firearm
but did not administer Miranda warnings at that time.  The
officers spent an additional 10-30 minutes searching the Coleman
vehicle for identification papers, registration, or narcotics,
and then secured the vehicle, while Coleman waited in
Przybylski's patrol car in handcuffs.

### A.  The First Disputed Uncounseled Statement

As Hall pursued other aspects of the investigation, such as
tracking down the vehicle's registration to a rental car company
and discovering no stolen vehicle report, Przybylski drove
Coleman on the three minute trip back to the police station.
Coleman asked for his cell phone so he might make a call, and
Przybylski replied that Officer Hall probably had it.  Przybylski
asked no questions and was listening to the police vehicle's
AM/FM radio when a report about the Yankees/Phillies World Series
game came over the radio, recapping the Yankees' loss.  Coleman,
evidently a Yankees fan, spontaneously responded to the radio,

---

[1] The Government does not seek to introduce these statements
made in response to custodial interrogation without Miranda
warnings or any applicable exception to Miranda requirements.

saying words to the effect that "I'm having a bad day.  I should not have left the gun in the open like that."

### B.  The Second Disputed Uncounseled Statement

At the police station, about 90 more minutes passed without the police initiating any questioning, until 4:49 A.M. when Officer Przybylski advised Coleman of his <u>Miranda</u> rights and Coleman executed the <u>Miranda Warnings</u> form (Ex. G-1).  Coleman indicated he understood these warnings and he refused to speak or answer any questions.  (<u>Id.</u>)  Interrogation ceased.  While being fingerprinted and photographed a few minutes later, he volunteered a second comment about the Yankees game, to the effect of "I can't believe I left the gun there.  I'm not having a good night.  The Yankees lost and now this."  Przybylski reminded Coleman that he had previously exercised his right to silence, and if he wanted to speak to the officer again, Przybylski would re-<u>Mirandize</u> him.  Coleman apparently declined to speak further and there were no further statements given.


### III.  LEGAL ANALYSIS AND FINDINGS

Defendant Coleman alleges that the officers had no justification to enter the vehicle and that the gun was not in plain view and thus seeks suppression of the gun.  Defendant also contests the admissibility of the alleged spontaneous statement by Coleman in the police car while being transported back to the

6

station as a fruit of the earlier custodial interrogation by Officer Hall about why Coleman had the gun.  Defendant contests the admissibility of the post-<u>Miranda</u> statement as a further fruit of the initial Hall questioning and as a violation of <u>Miranda</u> itself.

### A.  <u>Vehicle Search and Plain View Seizure</u>

A warrantless search of a vehicle is presumptively unreasonable under the Fourth Amendment, but that presumption can be overcome by exigent circumstances.  <u>Groh v. Ramirez</u>, 540 U.S. 551, 559 (2004).  This is true because, as the Supreme Court has stated, "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." <u>Mincey v. Arizona</u>, 437 U.S. 385, 393-94 (1978).  For example, as the Supreme Court reiterated in <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006), "law enforcement may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  <u>Id.</u>, citing <u>Mincey</u>, 437 U.S. at 392.

Once police officers are legitimately inside a home to render emergency assistance, "the police may seize any evidence that is in plain view during the course of their legitimate emergency activities."  <u>Mincey</u>, 437 U.S. at 393, citing <u>Michigan</u>

v. Tyler, 436 U.S. 499, 509-10 (1978).  Further, "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy."  Horton v. California, 496 U.S. 128, 133-34 (1990), citing Arizona v. Hicks, 480 U.S. 321, 325 (1987); Illinois v. Andreas, 463 U.S. 765, 771 (1983).  Under the plain view doctrine, items may therefore be seized without a warrant when (1) there is a prior valid intrusion, (2) the item discovered must be in plain view, and (3) it is immediately apparent to the police that the item is of incriminating character.  Horton, 496 U.S. at 136.

In the present case, the Government has amply demonstrated that the officers' warrantless entry into defendant's vehicle is justified by the emergency exception to the Fourth Amendment. The Court fully credits the testimony of Officers Hall and Przybylski.  They were called to the scene of a very unusual circumstance at 2:44 A.M.  An unknown driver in an unknown vehicle, bright lights on, radio loud, engine running, was totally unresponsive to the officers' attempts to rouse him, get his attention, and have him exit the vehicle.  The officers observed no sign of life, such as facial movement or breathing, as they banged on the windows of his car and shouted to him. They reasonably believed that he may be unconscious or in medical

distress and needed assistance.[2]  Whether he was intoxicated or
had a heart attack or stroke or diabetic coma were all realistic
possibilities.  Even ordinary intoxication would present an
emergency where the unresponsive man sits behind the wheel of a
vehicle with its engine running.  Their impulse, after trying all
reasonable means to rouse him, was to render assistance and
address an apparent medical emergency.

The officers' entry into the vehicle was for emergency
purposes.  There is no evidence that the officers were seeking to
collect evidence of a crime, nor that they knew Coleman or linked
him or his vehicle to other unlawful activity.  Their testimony,
including their concern for his health and well-being, distinctly
rang true.  When police officers do exactly as they should to
render emergency assistance, the object of their help, here Mr.
Coleman, will not be heard to complain that their protection of
his well-being invaded his privacy under the Fourth Amendment.

The officers' initial actions inside the vehicle were also
devoted to rendering aid to Coleman.  Officer Przybylski was
shaking his shoulder to attempt to rouse him, while Officer Hall,
from the passenger side, was attempting to get a pulse from

---

[2] Moreover, Coleman's medical distress was confirmed moments
after he was removed from the vehicle.  While Coleman was being
handcuffed on the ground, Hall observed a bandage on Coleman's
lower back area.  It is not disputed that back at the police
station, the officers saw bloody bandages covering a wound on
Coleman's lower back consistent with a gun shot wound, and the
officers arranged for examination and treatment.

Coleman's neck.  It was at that moment that Hall, while reaching across the console, discovered the gun in plain view.

The defense quarrels with this testimony and hypothecates that the console was closed and that it concealed the gun.  That the console can close, and is probably large enough to conceal a smaller handgun, is not in dispute and is shown by the photographs, Exs. G-3, 4 & 5.  Again, however, the officers' testimony rings true.  Officer Przybylski truthfully testified he could not see the gun because Coleman, sitting in the driver's seat, blocked his view.  Officer Hall, in first reaching in to turn off the ignition and then to feel for a pulse, was not looking around for evidence but unavoidably saw the butt end of the gun in the open console in plain view.

The motion to suppress the gun will be denied.

### B.  Defendant's Statement During Police Car Ride

Defendant argues that his statements to police during his police car ride should be suppressed as "fruit of the poisonous tree" of an unlawful search, arguing that any statements while Coleman was under arrest following the allegedly unconstitutional seizure of the weapon are tainted by the unlawful invasion of his vehicle, citing Wong Sun v. United States, 371 U.S. 471, 485-488 (1963).  Since the police seizure of the firearm was lawful, this argument fails.

After the suppression hearing, the Court received supplemental briefing on a different basis for suppression, raised by defense counsel during the hearing, namely whether Officer Hall's initial interrogation of Coleman at the scene, without <u>Miranda</u> warnings, in which Coleman admitted he had a gun "for protection," tainted the voluntariness of Coleman's subsequent statements to police because "the cat was out of the bag." In other words, assuming, as we do, that Hall's initial questioning violated <u>Miranda</u>,[3] does that interrogation taint the

_____

[3] The Government has argued that, even though it does not seek to introduce Defendant's response to Hall's initial interrogation, that such questioning, without the benefit of <u>Miranda</u> warnings, was within the "public safety exception" as recognized in <u>New York v. Quarles</u>, 476 U.S. 649 (1984). In <u>Quarles</u>, an officer apprehended a rape suspect who had run into a crowded supermarket carrying a gun. Upon patting him down, the officer observed an empty holster and asked the suspect where the gun was located. The suspect said, "The gun is over there." <u>Id.</u> at 652. The officer recovered the gun and thereafter read the defendant his <u>Miranda</u> rights. <u>Id.</u> The Court held that "the need for answers in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. <u>Id.</u> at 657. Similarly, officers about to enter a methamphetamine lab to execute a search warrant, concerned with booby traps, toxic fumes, and chemical explosions harming themselves and nearby neighbors may, under the public safety exception, question a suspect at the lab before entering without first complying with <u>Miranda</u>. <u>United States v. King</u>, 366 F. Supp. 2d 265, 274 (E.D. Pa. 2005), <u>aff'd</u>, 182 Fed. Appx. 88 (3d Cir. 2006).

In <u>Quarles</u> and in <u>King</u>, public safety was paramount because of obvious danger to officers and the public from the discarded gun and the dangerous clandestine laboratory.

In the present case, on the other hand, Officer Hall already had secured the gun before questioning Coleman. The question, "why do you have this gun?" does not direct itself toward a

two later statements given by Coleman that were not in response
to police interrogation?

The Government argues that the two statements at issue --
the first before Miranda warnings were given and the second after
the warnings -- were blurted out by Coleman and not in response
to interrogation and were not connected with Hall's earlier
interrogation.

In the present case, by the time Coleman made his statement
to Przybylski in the police car, he knew that the police had
already found his gun in the open console of his car, and a
period of at least 15 minutes and as much as 35 minutes had
elapsed since he had responded to Hall's uncounseled questioning
asking why he had the gun, but there had been no intervening
Miranda warning.  It is undisputed, as Officer Przybylski
testified, that Hall was not present, since he had his own patrol
car and was pursuing other aspects of the investigation.
Przybylski had never questioned Coleman, nor did Przybylski
initiate any conversation or questioning in the patrol car.

---

public safety concern because the gun was known, it was in police
custody, and was secure.  Likewise, Hall's purpose in asking the
question was to determine if Coleman had an innocent reason to
possess the firearm, such as being an off-duty police or
sheriff's officer, and not due to any public safety concern,
according to Hall's testimony.  Absent circumstances posing an
objective danger to the police or public from the weapon, this
exception does not apply.  United States v. Mobley, 40 F.3d 688,
693 (4th Cir. 1994), quoting Quarles, 476 U.S. at 659 n. 8;
United States v. Newton, 369 F.3d 663-64, 679 (2nd Cir. 2004).

Instead, Coleman, after sitting alone for at least 10 and as many as 30 minutes in the locked patrol car (while the officers were following up on inspecting and identifying the vehicle) chose to initiate conversation on this ride, asking Przybylski about his cell phone, and then volunteering his incriminating statement to the effect that "I should not have left the gun in the open like that."

The question arises whether his police car statement to Przybylski was prompted by Hall's questioning at the scene ten to thirty minutes earlier.  If so, the statement is in response to custodial interrogation without <u>Miranda</u> warnings.  If his statement was unprompted and self-initiated, even though made while in custody, it is a spontaneous admission that does not violate <u>Miranda</u>.  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).

When a police officer instigates custodial questioning, statements made by the suspect in response are deemed involuntary under the <u>Miranda</u> rule.  Thereafter, if <u>Miranda</u> warnings are administered by police and understood by the suspect, interrogation may resume and a subsequent statement may be voluntary and admissible so long as it is sufficiently distant from the initial statement.  See <u>United States v. Tyler</u>, 164 F.3d 150, 158 (3d Cir. 1998).  In such a circumstance, where the <u>Miranda</u> warnings precede the second interrogation, the inquiry

13

whether the second statement is sufficiently distant "must include, but not necessarily be limited to, factors such as who initiated the [second] interrogation, the time that elapsed between the two interrogations, the extent to which the same police were involved in both interrogations, the manner in which the [second] interrogation was conducted, and any other factor that is relevant to deciding whether police exploited their prior disregard of [the defendant's] right to remain silent in obtaining the [second] statement." Id.  Thus, the taint of an earlier non-Mirandized interrogation may in some circumstances be overcome by the administration of Miranda warnings before interrogation resumes so long as the second statement is not involuntary.  Oregon v. Elstad, 470 U.S. 298 (1985).

In the present situation, with respect to Coleman's statement during the police car ride, there was no intervening Miranda warning but there was also no interrogation.  A rule that held that custodial interrogation without Miranda will preclude admissibility of all subsequent statements by the accused would suppress even spontaneous unconnected statements by the accused. Where Miranda is designed to deter police misconduct during custodial questioning, its purpose would not be served by excluding even distant spontaneous statements that are not in response to questioning.

14

In the present case, many facts point to the voluntariness of the police-car statement. Principally, it was not in response to police interrogation; Coleman made the statement to Przybylski, while it had been Hall who made the earlier inquiry; at least ten minutes and as much as thirty minutes had elapsed since Coleman made his statement to Hall, during which time Coleman was in solitude in the police car with a chance to reflect and clear his mind in assessing his situation; Coleman had an extensive prior record of convictions and was no novice to the law enforcement system[4]; Officer Przybylski did nothing to prompt him to speak; Coleman began the conversation by asking about his cell phone to which Przybylski responded appropriately. As Przybylski drove, listening to the radio, Coleman volunteered his statement, "I should not have left the gun in the open like that." The fact that Defendant's statement was not the result of interrogation is a very strong indicator of its voluntariness. Medeiros v. Shimoda, 889 F.2d 819, 824 (9th Cir. 1989) (blurt-out after unwarned interrogation should not be suppressed); United States v. Abdulla, 294 F.3d 830, 836-37 (7th Cir. 2002) (same);

---

[4] Coleman's previous felony convictions, as set forth in the Government's Brief, include possession of a firearm with an obliterated serial number, 3 counts (1999), possession of a firearm by a convicted felon (2009), possession with intent to distribute cocaine (1999), aggravated assault (1999), and possession of a firearm for an unlawful purpose (1999).

15

<u>United States v. Pettigrew</u>, 468 F.3d 626, 635-36 (same); <u>United States v. Cottman</u>, 497 F. Supp.2d 598, 605 (D. Del. 2007) (same).

Likewise, the Court does not perceive that Defendant made his spontaneous statement in the police car out of a sense that he had already answered the earlier question about why he had the gun. If "the cat was out of the bag," as the defense argues, it was because he knew the police had already lawfully seized the gun sticking out of the console beside him, in a vehicle in which he was the only occupant. It took no imagination for the police to conclude he knowingly possessed this gun under these circumstances, because they saw as much with their own eyes.

The Government has demonstrated that Coleman's statement in the police car was sufficiently distant in time and circumstances that it cannot be seen as a continuation of Coleman's response to Hall's earlier question. The Government has also met its burden of demonstrating the voluntariness of Coleman's statement, such that it was not the product of police interrogation or coercion. Accordingly, the Court finds that Coleman's statement in the police car is admissible and Coleman's suppression motion is denied as to that statement.

C. **Defendant's Post-Miranda Statement during Fingerprinting**

Defendant's later statement to Przybylski, after <u>Miranda</u> warnings were administered and understood at the police station, was voluntary and admissible. In <u>Elstad v. Oregon</u>, the Supreme

16

Court addressed the circumstance where a later Miranda warning separated an earlier unwarned police interrogation fro a later statement.  The touchstone is whether the voluntariness of the Mirandized statement is compromised by the earlier custodial interrogation.  Elstad v. Oregon, 470 U.S. at 318.  Elstad cautions strongly against finding compulsion for a statement made after subsequent Miranda warnings.  Id.

As found above, Officer Przybylski administered Miranda warnings which Coleman understood and signed at 4:49 A.M., which was two hours after Coleman was taken into custody at the scene. When Coleman indicated he didn't want to answer questions about the gun, interrogation stopped.  Routine fingerprinting began. Within a few minutes, Coleman started talking again, reproaching himself for leaving the gun in plain view:  "I can't believe I left the gun there.  I'm not having a good night -- the Yankees lost and now this."

Applying the Third Circuit's test of voluntariness in United States v. Tyler, supra, 164 F.3d at 158, the Court finds that Coleman understood his right to silence and was not even responding to police interrogation.  He volunteered this incriminating statement, and it is admissible in evidence.

IV.  **GOVERNMENT'S MOTION TO ADMIT EVIDENCE OF COLEMAN'S POSSESSIONS OF FIREARMS**

Shawn Coleman is charged with knowingly possessing a firearm bearing an obliterated serial number after having been convicted

17

of a felony offense in the District of New Jersey, in violation
of 18 U.S.C. § 922(g)(1) and § 2.  The Government seeks a
pretrial ruling that the facts of Coleman's prior conviction for
the same offense in United States v. Shawn Coleman, Criminal No.
98-36 (JWB), for which he was sentenced to a 29-month term of
imprisonment in 1999, and as to which his term of supervised
release was violated by  his possession of a .32 caliber handgun
with which he accidentally shot himself in the leg in 2007, are
admissible under Rule 404(b), Fed. R. Ev.  The Government must
prove beyond a reasonable doubt Coleman's knowledge of his
possession of the handgun on November 5, 2009, and in the present
motion the Government argues that Coleman's prior conviction and
his revocation of supervised release are admissible to show his
lack of mistake or accident.  Defendant opposes arguing that such
evidence would be impermissible evidence of defendant's character
or propensity to act in conformity with his prior bad acts, and
therefore precluded by Rule 404(b), and alternatively because it
would be unduly prejudicial under Rule 403 when weighed against
its probative value.

    Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is
> not admissible to prove the character of a
> person in order to show action in conformity
> therewith.  It may, however, be admissible
> for other purposes, such as proof of motive,
> opportunity, intent, preparation, plan,
> knowledge, identity, or absence of mistake or
> accident, provided that upon request by the

accused, the prosecution in a criminal case
shall provide reasonable notice in advance of
trial, or during trial if the court excuses
pretrial notice on good cause shown, of the
general nature of any such evidence it
intends to introduce at trial.

Rule 404(b) is a rule of inclusion rather than exclusion,
United States v. Daraio, 445 F.3de 253, 263 (3d Cir. 2007),
citing United States v. Givan, 320 F.3d 452, 460 (3d Cir. 2003);
United States v. Jemal, 26 F.3d 1267, 1272 (3d Cir. 1994).  The
Third Circuit has continuously indicated that the admission of
Rule 404(b) evidence is favored "when it is relevant for any
other purpose than to show the defendant's propensity to commit
the charged offense."  Daraio, 445 F.3d at 263, quoting Givan,
320 F.3d at 460.

To show a proper Rule 404(b) purpose, the Government must
"proffer a logical chain of inference consistent with its theory
of the case," United States v. Sampson, 980 F.2d 883, 888 (3d
Cir. 1992).  The Government "must clearly articulate how that
evidence fits into a chain of logical inferences, no link of
which can be the inference that because the defendant committed
[the same type of] offenses before, he therefore is more likely
to have committed this one."  United States v. Lopez, 340 F.3d
169, 173 (3d Cir. 2003) (citing Sampson, 980 F.2d at 887).  In
this case, the Government proffers that evidence of the 1999
conviction and 2007 incident giving rise to the 2009 violation of
supervised release demonstrate that the gun in question was

19

present not by accident or mistake, which is a purpose condoned
by Rule 404(b), supra.  It is logical, if there is an issue in
this trial, that there is no accident or mistake inherent in this
gun's presence in Coleman's vehicle in November, 2009, because
Coleman previously had possessed such firearms and knew it was
illegal for him to do so.  If Coleman seeks to raise doubt that
his possession was knowing or that the weapon found in his car
must have been put there by someone else, such 404(b) evidence
would be powerfully probative to overcome such a defense.  On the
other hand, admitting such evidence runs a risk that the jury
could conclude from his prior conviction for an identical offense
and his illegal possession of a firearm on supervised release,
that he must have committed this crime merely because he's done
it before.

     Therefore, the Court, under Rule 403, must balance the
probative value of this prior crimes evidence against the danger
of unfair prejudice to the accused.  Rule 403 provides:

>           Although relevant, evidence may be
>      excluded if its probative value is
>      substantially outweighed by the danger of
>      unfair prejudice, confusion of the issues, or
>      misleading the jury, or by considerations of
>      undue delay, waste of time, or needless
>      presentation of cumulative evidence.

     In weighing the probative value against the undue prejudice,
the Court is also called upon to assess the Government's need for
this evidence.  If, as Rule 403 states, the admission of prior

crimes evidence would cause undue delay, waste of time, or presentation of cumulative evidence, the balance should be struck against inadmissibility.

In the present case, it is difficult to make this ruling in a vacuum before trial because it is not known whether the defendant is claiming accident or mistake or some similar lack of knowledge or responsibility for the firearm found in his console. The Government's brief itself argues that, based on Coleman's own statements about the gun, found to be admissible above, Coleman would be hard-pressed to now claim lack of knowledge, accident, or mistake.  See Gov't Br. at 18 ("Coleman cannot profess a lack of knowledge that the gun was present.")  Nor, from the present record, does Coleman seem inclined to profess a lack of knowledge that his possession of the gun was illegal.  The Rule 404(b) evidence here would be cumulative of the direct evidence of his knowledge of illegality that is already demonstrated from his own statements to police.  On the other hand, the Government would likely show that the probative value is not substantially outweighed by unfair prejudice to Coleman if Coleman directly (through argument or testimony) or indirectly (such as through cross-examination) disclaims knowledge that the gun was present or that his possession of it was illegal.  In such a turn of events, the Government would have an enhanced need for admitting

21

this prior crimes evidence to rebut Defendant's argument or evidence.

It suffices to say that this issue is presently premature and that it will be revisited at the start of trial, or at any point in the trial, upon the Government's request. The Government has given ample notice to the defense under Rule 404(b), and the Court's determination will await further developments. A determination is therefore deferred until the start of trial, and prior to opening statements if necessary.

### V. GOVERNMENT'S MOTION TO USE COLEMAN'S PRIOR CONVICTIONS FOR CROSS-EXAMINATION IF COLEMAN ELECTS TO TESTIFY

Should Defendant Coleman elect to testify in his own defense, the Government seeks to use his prior convictions to impeach his credibility on cross-examination under Federal Rule of Evidence 609(a)(1).

Rule 609(a)(1) provides that "evidence that an accused has been convicted of such a crime [punishable by death or imprisonment in excess of one year] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." The prior federal conviction herein is within the 10-year time limit of Rule 609(b) because Defendant's trial testimony would be within 10 years of his release from confinement for his 1999 conviction in United States v. Shawn Coleman, Criminal No. 98-36

22

(JWB), supra, including his returns to custody under his
subsequent supervised release violations in December, 2004 and
April, 2009.  He was sentenced more than 10 years ago on three
felonies in the State of New Jersey (possession with intent to
distribute cocaine, aggravated assault, and possession of a
weapon for an unlawful purpose, each sentenced on December 6,
1999), but it is unclear whether his custodial terms for those
crimes continued into the 10-year period before this trial.
Ascertaining the dates of release from state custody will be
requisite to applying the Rule 609(b) timing test.

In determining whether the probative value of a prior
conviction outweighs its prejudicial effect under Rule 609(a)(1),
the relevant factors include:  (1) the nature of the crime; (2)
when the conviction occurred; (3) the importance of the
defendant's testimony; and (4) the degree to which the
defendant's credibility is central to the case.  Government of
the Virgin Islands v. Bedford, 671 F.2d 758, 761 n.4 (3d Cir.
1982); see also United States v. Johnson, 388 F.3d 96, 103-104
(3d Cir. 2004) (McKee, J., concurring) (reaffirming the
continuing validity of the Bedford balancing test).

At present, the record is unclear which convictions the
Government seeks to use as impeachment and whether each satisfied
the timing rule.  More importantly, it is unknown whether
Defendant Coleman intends to testify at trial, and thus it would

23

be a hypothetical exercise for the Court to determine several of the Bedford factors at this time, such as the importance of defendant's testimony or the extent to which his credibility is central to the case, which turns upon what his testimony, if any, is expected to be.  Further, defense counsel's Reply Brief does not address this motion, so it may be surmised that Defendant does not plan to testify in any event.

Thus, the Court will defer ruling upon this question until trial.  If Defendant either announces he intends to testify, or actually testifies, the Court will be in a position to make this determination because there will be a concrete need for a decision.  If Defendant is not testifying, this decision would be superfluous.  Thus, on this motion the Court defers decision until trial.

The accompanying Order will be entered.


**July 1, 2011**                          **s/ Jerome B. Simandle**
Date                                JEROME B. SIMANDLE
                                    U.S. District Judge